IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CAMPANIA MINERA CAOPAS, S.A. de C.V.,

    Plaintiff,

v.

THE *M/V CSL ACADIAN* (IMO NO. 8009571), HER ENGINES, TACKLE, FURNITURE, MACHINERY, EQUIPMENT AND APPURTENANCES AND FREIGHTS, ETC., *in rem*, and CSL INTERNATIONAL, INC., THE CSL GROUP, CANADA STEAMSHIP LINES, FB SHIPPING, INC., *in personam*,

    Defendants.

No. C 07-04722 WHA

**FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER BENCH TRIAL**

    This admiralty case features the total destruction of a mooring dolphin. The main issue is whether it collapsed on its own or was shoved over by defendant vessel. This order follows a bench trial, oral argument, and two rounds of proposed findings.

    \*    \*    \*

    On May 26, 2007, the *M/V CSL ACADIAN*, a large bulk carrier, was attempting to align itself alongside a row of mooring dolphins at Santa Rosalia in Baja California. It was a couple of hours after sundown and the weather was clear. The seas were normal and somewhat above mean low tide. A modest current moved toward Dolphin No. 3 from the north-to-northwest.

The dolphins were a key part of a port facility operated by Campania Minera Caopas S.A. de C.V., our plaintiff. Nearby, Caopas mined gypsum. It was then conveyed to the port facility arranged as shown below. A conveyer belt, pivoted at the center, could swing around the outer ring so as to carry gypsum to a point hovering over a hold. The gypsum then fell off the conveyer and into the hold. In this way, holds could be loaded with gypsum in seriatim for the conveyer belt could be moved along the ring as necessary to overhang the hold to be filled. Vessels were accustomed to tying alongside one of two available rows of dolphins. The arrangement looked like this:



The Caopas Ring and the Dolphins

This case involves Dolphins 3, 4 and 5. They were built in 1989. Each was an above-water deck about the size of a tennis court supported by fifteen pilings, long steel pipes. The pilings were driven thirty feet into the seabed, about a hundred feet below. From top to bottom, the pilings all remained within the footprint of the deck, although they angled down at slightly off-vertical angles so as to provide "batter," *i.e.*, to provide more sidewise resistance to movement of the deck. Crews could work on each deck. Also, each deck had a bollard-type "pin." To these, ship lines could be fastened.

The *ACADIAN* was a Panamax vessel, *i.e.*, the maximum size that passes comfortably through the Panama Canal. The seventy-ton vessel was 804 feet long and 106 feet wide with a draft of about 35 feet. The *ACADIAN* belonged to defendant CSL International, Inc., and there

2

1  was a longstanding relationship between CSL and Caopas by which many CSL vessels like the
2  *ACADIAN* and including the *ACADIAN* made regular calls at Caopas to load gypsum for
3  delivery to various customers of Caopas. The *ACADIAN* looked like this:



The *ACADIAN*

10  Local law mandated that a pilot be used. The local pilot was familiar with the approach
11  to the facility. The approach to the facility was also well known to CSL and the *ACADIAN* by
12  reason of many previous calls to the same facility. A CSL document on board (TX 216)
13  described a recommended CSL approach to the dolphins in question, as did, at trial, the chief
14  master of the CSL line. The ship was supposed to approach on a heading somewhat parallel to
15  the row of Dolphins 3, 4 and 5 but 100 meters or more away (to the north). Once halted, the
16  ship was supposed to toss lines down to mooring boats that would carry the lines to the dolphins
17  where they were to be tied to pins on the dolphins, including on No. 3. Then the ship's
18  winches would be used to slowly pull it into position alongside the dolphins. Put differently,
19  the known conventional approach was *not* to steam right alongside the dolphins and to abruptly
20  halt. The more elaborate winching approach was used because tugs were not available at
21  Caopas and because it was prudent. The unavailability of tugs was well known to all involved.
22  All were also aware that the berths were exposed.

23  On the evening in question, the *ACADIAN* waited about a mile offshore for the local
24  pilot to come aboard. He was Captain Edmundo Elizondo Encinas. After the pilot was aboard,
25  he gave directions. Each direction was seconded by the master and then executed. The master
26  at any time could have refused any pilot direction. He always had the responsibility to navigate
27  the ship safely. The ship's master was Captain Volodymyr Eilippon.
28

3

The vessel proceeded but its path veered too far southward, *i.e.*, south of the normal approach line, which has been called herein the "317 degree approach." At this point, the vessel could have aborted the approach but it tried to correct for the error while proceeding ahead. As the ship came in, the ship was far closer to the dolphins than the 100-meter-plus conventional approach. In fact, it was dangerously close. Fearing for their safety, the crew waiting on the deck of No. 3 scrambled off the dolphin and onto the ring. The bow of the ship cleared No. 3 but, due to current or side-wash propeller action or bridge commands or a combination thereof, the port side (at midship) crashed into No. 3. The impact was mostly in the sidewise direction (southerly). The speed of the vessel was half a knot at impact. This order finds that all in charge of the vessel were negligent in approaching too fast and too close and in failing to execute the conventional approach.

The impact wrecked Dolphin No. 3. The dolphin deck was pushed 26 feet to the side and slightly forward, causing many of its pilings to fail and leaving the deck, after the ship moved away, listing at eleven degrees. During the impact, the ship pushed hard on the pilings and dolphin deck. The force was sufficient to cause a large gash on the port bilge keel of the vessel and to leave a corresponding gouge on a piling immediately adjacent to the vessel. Without question, the force of the massive ship against the dolphin was huge. After the crash, Dolphin No. 3 looked like this drawing:



Dolphin No. 3 After Wreck

4

* * *

Defendant CSL disputes this finding. CSL maintains that the ship came in safely, stopped alongside the dolphins and merely "nudged" No. 3, whereupon it collapsed from years of alleged neglect, poor maintenance and poor design. This is reminiscent of the slapstick scene in the old silent movies where the hero walks up to a house, knocks on the door, and the entire house collapses. CSL's story that the approach was uneventful and safe cannot be reconciled with the weight of the evidence, including the following:

- The underwater images of the wrecked pilings show considerable stress of the type consistent with being pushed laterally by an extreme sideways force. At trial, this was convincingly explained by Expert Boone. The mangling was inconsistent with CSL's theory that the fifteen pilings simply broke up or dissolved simultaneously due to the weight of the dolphin deck and a "nudge" from the vessel.
- The crew onboard the dolphin testified that the vessel was approaching too fast and they ran for their lives in the final stages when the allision seemed imminent. This testimony is credited.
- The GPS data are most consistent with the off-course approach described above. In accepting this finding, the Court does not accept all of plaintiff's slick and less-than-totally-accurate animation.
- The pilot stated on the radio immediately after the crash and while he was still on the bridge that the "current fucked him" or words to that effect, indicating that he himself realized the vessel's approach had been flawed.
- The large dent in the bilge keel and the corresponding fresh gouge on a piling nearest the vessel fit together like a hand and glove and are consistent with the findings above, *i.e.*, that the port side of the hull crushed the pilings. This order rejects CSL's sheer speculation that they "could have" been made earlier and elsewhere.

5

- Finally, given that the dolphin was in a serviceable state of repair, it is obvious that a massive force would have been needed to wreck it. That it was so wrecked indicates that no mere nudge occurred.

As to the last point, CSL contends that the dolphin was not in good shape and that it was poorly designed and poorly maintained and, indeed, on the verge of collapse on the night in question. This is rejected. Although the inspection and repair records are sporadic, they do not prove the thesis that the pilings were corroded to the point of collapse. In this regard, the following further points deserve mention:

- The dolphins, including No. 3, were regularly used as anchor points by ships to winch themselves in from as far away as 200 meters. This, in fact, was the conventional approach. Ship winches would be used to move a ship closer and closer until it could tie up alongside the row of dolphins. Although several dolphins served together in such a maneuver, No. 3 by necessity had to support considerable lateral pull from the lines anchored thereon. This process had occurred regularly over many years with no evident degradation of the integrity of the dolphins. That the dolphins had successfully withstood such lateral stress hundreds of times militates against the possibility that they were so flimsy as to collapse like a deck of cards from the slightest nudge. Indeed, the only dolphin ever to collapse was No. 3 when it was struck by the *ACADIAN*.

- At closing argument, CSL counsel suggested that the regular pull of winch lines did not really involve much, if any, stress. Rather than winching, he said, the current or perhaps selective use of the engines were used to move vessels from the conventional stopping point to the moored position, a sideways distance usually over the length of a football field. The evidence does not support this thesis. A moment's thought exposes its flaws. If, for example, it were merely the current

6

that moved the vessel and not the winch lines, when the vessel reached the dolphin, the current would continue to push the vessel against the dolphins and lateral force would be exerted on the dolphin in that manner. What is more, when the current was in the *opposite direction*, the pull on the winch lines would have to be all the more. But most of all, as shown by the evidence, the whole point of the winching was to *pull* the vessel sidewise to the row of dolphins, using the dolphins as anchor points. Lateral pull on the dolphins was inherent in the pull of the lines.

- To be sure, the evidence is spotty as to maintenance and repair, but that does not prove that the pilings were about to fail. It just means the records are thin. Some repairs were clearly made. For example, the 1999 repairs to three of the fifteen pilings on No. 3 were proven. Although these repairs may have weakened No. 3 slightly, the evidence does not show that the overall integrity of No. 3 was below serviceable use. Complaining about these minor issues in the face of the crushing force of the crash itself is like complaining about the arrangement of deck chairs as the *Titanic* went down.

At trial, CSL made much of the shortcomings in the opposing animation, particularly as to the course and speed of the vessel. This animation was based on the GPS information that survived. However, the CSL ship captain destroyed a wealth of additional information that would have been probative. Within twelve hours of the event, he was supposed to have pushed the "save button" on the SVDR system to save a treasure trove of voice and engine controls, course data and other information (akin to a black box on an airplane). *He did not save the evidence.* This meant that it was later overwritten. For example, the voice recorder might have revealed frantic commands and responses and confirmed the radio report of the pilot that the currents "had fucked him." This destruction warrants an adverse inference (and the Court so infers) that the evidence so destroyed would have cast the captain and its control in an

7

unfavorable light.  And, it should be said again that the Court has only relied on the most incontrovertible aspects of the animation, mainly the underlying GPS data that did survive.

In short, this order finds the sole cause of the loss of Dolphin No. 3 was the reckless approach of the *ACADIAN*.  It is unnecessary to reach the more exotic legal theories of liability.

*          *          *

As to damages, plaintiff is entitled to be made whole.  The damages in this case include the costs (temporary and permanent) of replacing the destroyed dolphin, interest costs and costs associated with delayed shipments of gypsum.  In total, plaintiff seeks damages of roughly $10,340,000.  As will be explained, a portion of the claimed recovery is speculative, unproven or otherwise unrecoverable.  Plaintiff's recovery will be $5,124,455.82.

Most of plaintiff's damages were for a permanent replacement for No. 3.  Plaintiff contracted with Ruskin, a Canadian company, to replace the destroyed dolphin.  Plaintiff also employed the services of an engineer, George Gauld of ATI Engineering Services, both to design and oversee Ruskin's construction of the project.  Plaintiff claims $8,012,689 for the Ruskin contract and an additional $646,827 in affiliated costs, including ATI's services.

The value of the Ruskin contract is disputed.  Plaintiff's *original* contract with Ruskin was a "cost plus" contract estimated at $3.1 million.  After work on the project began, the engineer in charge, Mr. Gauld, "discovered" that piles remained from the old No. 3 protruding in the bed.  Plaintiff therefore had two choices:  either to dig out those old piles and then build, or slightly to relocate the replacement dolphin (and to leave the old piles in place).  Plaintiff was informed that Mr. Gauld's analysis favored moving the new dolphin slightly to the south, and that option was selected.  This change, however, had broader ramifications for the project. *First*, the altered location meant that the distance between the replacement dolphin and the old dolphin number four was too great for smaller ships.  There would be instances where the front or the rear vessels would lack support while being loaded.  *Second*, the new location was removed from the "beam support," the walking path connecting various points at the facility, and therefore the new plan required a gangway to be built from the beam support to the new

8

dolphin. For these two additional steps, Ruskin quoted plaintiff an additional $1,200,000, of which $800,000 (plaintiff was told) was for materials alone.

A contract dispute then arose between plaintiff and Ruskin, one which has yet to be resolved. Plaintiff understood that, in adding $1,200,000 to the contract, the agreement changed from a "cost plus" to a "fixed price" contract totaling $4,300,000. Ruskin evidently understood differently. Ruskin claimed (and still claims) that the contract remained a "cost plus" agreement and that, as costs of the project rose, plaintiff's obligation under the contract rose to $8,012,689. To date, plaintiff has paid $4,250,000.

Plaintiff and Ruskin have engaged in settlement talks but this standoff remained still unresolved at the end of our trial. Ruskins' most recent offer was to "meet [plaintiff] in the middle" of the two sides' prior offers of $5 million and $5.4 million, respectively. The evidence thus indicates that the obligation is likely to be satisfied for approximately $5.2 million. The additional sums plaintiff seeks are entirely speculative and (if awarded) could well amount to a windfall recovery. The damages for the permanent repair work performed by Ruskin will be $5.2 million.

Plaintiff also expended an additional $646,827 in costs affiliated with the permanent repair of the dolphin. Plaintiff paid $416,189 directly to ATI Engineering Services for the engineering work of Mr. Gauld in support of Ruskin's construction work. Additionally, plaintiff expended $230,638 directly on labor, equipment and materials that were too expensive or impracticable to bring from overseas to help Ruskin complete the project. The total cost for the permanent repairs — including these two sums plus the Ruskin contract itself — is found to be $5,859,516.

Plaintiff, however, replaced an *old* dolphin with a *new* one, thus extending the dolphin's expected life. Reimbursement of the full value of the permanent repairs would therefore confer a windfall. The cost of replacing the destroyed dolphin must be reduced in proportion to the dolphin's age and depreciation at the time of the incident. The terminal was designed in 1989 and, absent further testimony on the subject, is presumed to have been constructed the same year. Although by the time of the incident (May 2007) there had been some damage or wear-and-tear

9

1  to the eighteen-year-old dolphin, and some ensuing repairs thereto, on balance the record
2  provides no reason to depart from a linear path of depreciation.

3  The task is complicated, however, by the fact that the record contains no evidence
4  identifying the useful life or rate of depreciation of the dolphin or the terminal. As explained,
5  plaintiff evidenced its out-of-pocket expenses for the repairs; it is defendants who urge that
6  any recovery be reduced by the facility's remaining useful life yet neither side provided
7  evidence on the subject. A forty-year useful life is adopted.[1] The remaining useful life of the
8  eighteen-year-old dolphin is therefore twenty-two years, and plaintiff's recovery will be 22/40ths
9  (55 percent) of its actual expenditures on the construction: $3,765,754.85. Plaintiff's recovery
10 for the permanent repairs (the Ruskin contract, the ATI fees and plaintiff's direct expenditures
11 for labor, machinery and materials in support of the project) will be in that amount.

12                    *             *             *

13 Defendants argue that the recovery must be further reduced because plaintiff replaced
14 the destroyed dolphin with *two* new dolphins. Defendants claim that plaintiff not only replaced
15 the destroyed dolphin No. 3 but also took the opportunity to replace the old dolphin No. 4.

16 The second replacement dolphin, however, was necessary under the circumstances.
17 The record (as well as common sense) indicates that plaintiff could not place the new,
18 replacement dolphin number three in precisely the same position as the old one given the old
19 pile remnants. Defendants do not seriously contest this fact. Plaintiff was therefore confronted
20 with the choice of digging out the old piles, or alternately of relocating the replacement dolphin.
21 Plaintiff made a reasonable choice and defendants must live with the consequences, for
22 defendants were the cause of the wreck in the first place.

23 Urging a contrary finding, defendants rely on Mr. Audelo who testified that, in his
24 understanding, No. 3 was replaced with two dolphins, the second being a replacement for No. 4.
25 He reviewed documentation indicating that dolphin four's fender had been removed, which he

---

[1] *See Crescent Towing & Salvage Co., Inc. v. M/V CHIOS BEAUTY*, 2008 WL 3850481 (E.D. La. 2008) (mooring dolphin found to have 40-year useful life); *In Matter of Complaint of M & M Towing Co.*, 1997 WL 96377 (E.D. La. 1997) (same); *Petro United Terminals, Inc. v. J.O. Odfjell Chemical Carriers*, 756 F. Supp. 269 (E.D. La. 1991) (dolphin had 45-year life span).

10

interpreted to mean that the dolphin "would be out of service." When pressed, however, he admitted that, although two new dolphins had been installed, he did not know if No. 4 had been removed. He further testified that he could only identify the purpose of the work on No. 4's fender as "[t]o give more space between the dolphin and the vessel," not to permanently take the dolphin out of service. Other uncontradicted testimony established that plaintiff does *not* plan to remove the old dolphin number four (at least, that Mr. Boone was so informed) and that the work on that dolphin's fender was simply to reduce its size rather than to take it permanently out of service. This testimony (rather than defendants' version) is credited.

Defendants also insist that the permanent repair work reasonably could have been completed for a mere $2,337,479 (before any depreciation adjustments), had plaintiff utilized local companies to perform the work. Defendants maintain that local companies were available to do the job — Mr. Audelo testified that he had consulted a Mexican government website that published bids for public contracts, and he found that nine companies had bid for the construction of a terminal relatively close to Santa Rosalita. Mr. Audelo admitted, however, that he undertook no further investigation and identified no companies that were known to have been available to perform this specific project. Plaintiff, in contrast, testified that it looked for local companies to do the work prior to engaging Ruskin and found none, because at the time, local companies were occupied expanding oil companies' capacity at sea. Plaintiff's choice of Ruskin was reasonable. Mr. Audelo's $2,337,479 estimate assumes that a local company was available to perform the work for less money, and in all respects is not further explained.

*       *       *

Plaintiff also seeks temporary repair costs totaling $946,488. These costs were essentially interim measures necessary to replace No. 3 until the permanent replacement dolphin was constructed. The claimed amounts include $285,306 for cleaning debris to keep the mooring line clear and removing pile stops from the bottom of the ocean; $517,312 for the use of charter of tugboats engaged at the request of the *ACADIAN* to stabilize the vessel absent dolphin number three (rent, fuel, crew and port expenses); $133,310 for temporary mooring buoys, and anchors and chains therefor, which replaced the tugboats once they were in place; and $10,560

11

for temporary piles to support the radial beam (*i.e.*, the walkway connecting various parts of the facility). These expenditures are documented and, and with one exception, defendants raise no weighty challenge to them. The exception: plaintiff admitted that it still has, and intends to keep, the temporary mooring buoys. It may be that plaintiff would not have purchased those but for the incident, but full compensation for them would occasion some degree of windfall. Plaintiff will recover half of the cost of the buoys: $66,655. The total recovery for temporary repairs will therefore be $879,833.

Plaintiff identifies two final sources of damages. *First*, plaintiff suffered $118,302.97 in losses suffered as a result of a cargo shipment delayed as a result of the damaged dolphin and plaintiff's resulting inability to satisfy the gypsum needs of one of its customers. Plaintiff was required by contract to provide the gypsum and therefore was forced to look to alternate sources to do so, causing a loss. *Second*, plaintiff had to finance the construction of the replacement dolphin with two credit lines (totaling roughly $4.5 million), and in so doing expended $360,565 in interest to date. Each of these amounts has been persuasively proven.

*         *         *

Plaintiff's claim for damages of $300,000 for the internal cost of capital of roughly $3,000,000 of internally financed expenditures is rejected. The damages are not satisfactorily explained or proven. Such an expense would imply that plaintiff was required to finance — through borrowing and its own funds — expenditures of some $7.5 million. The out-of-pocket expenditures, however, were less than that, and as explained, a portion of the funds that *were* expended (the portion attributable to extending the useful life of the dolphin) are unrecoverable. The internal cost-of-capital expense is not supported by the record.

*         *         *

In sum, plaintiff's damages, all to be adjudged against defendants, are found to be as follows:

| | SOURCE | DAMAGES |
|---|---|---|
| 1. | Permanent repairs | $3,765,754.85 |
| 2. | Temporary repairs | $879,833.00 |
| 3. | Interest | $360,565.00 |
| 4. | Losses from shipment delay | $118,302.97 |
| | **Total**: | **$5,124,455.82** |

## CONCLUSION

Judgment for plaintiff in the amount of $5,124,455.82 will be entered.

**IT IS SO ORDERED.**[2]

Dated: March 6, 2009.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

---

[2] Although voluminous proposed findings were submitted and considered, this order has found its own way and made its own findings rather than picking and choosing between the competing versions. That a proposed finding has not been expressly incorporated does not necessarily mean it has been rejected; rather, it means that this order has found it unnecessary to adopt or reject it per se. To the extent, however, that any proposed finding was expressly admitted by the responding party in the most recent round of proposals and responses, this order hereby adopts the proposal (to the extent expressly admitted). It is unnecessary for this order to cite the record and it will not do so except to particulars that may assist the court of appeals.